IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GERARD NUOVO,

      **Plaintiff,**

      v.

CAROLINE WHITACRE, et al.,

      **Defendants.**

Case No. 2:10-cv-240
JUDGE GREGORY L. FROST
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. # 4), a memorandum in opposition filed by various defendants (Doc. # 11), and post-hearings memoranda filed by all of the parties (Docs. # 26, 29, 30). For the reasons that follow, this Court finds the motion not well taken.

### I. Background

The following facts are set forth for the limited purpose of addressing the immediate motion before the Court. The parties should note that any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on the merits. *See United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (citing *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981)).

Plaintiff, Dr. Gerard Nuovo, is physician, cancer researcher, and professor of pathology employed at The Ohio State University ("OSU"). His litigation involves three basic sets of events: a "whistleblowing" report of asserted misdiagnoses and two research misconduct allegations, one of which stretches across multiple years. The Court will briefly summarize the

essential facts of each series of events, as well as an intervening lawsuit Plaintiff filed.

In January 2006, Plaintiff reported what he asserts is the misdiagnoses of women that resulted in the unnecessary removal of cervixes, which he testified increased the risk of women losing their babies. After reporting these allegations, Plaintiff suffered a number of career setbacks: he was removed as the Director of Cytology, removed from the Gynecological Pathology Lab, and had no job duties related to the treatment of women. Plaintiff essentially became only a researcher, and he soon thereafter received a "D" performance evaluation, which contrasted with a prior marks of "A/A+." The reduced responsibilities carried with them an initial reduction in available income, although more recently the university increased Plaintiff's income in response to his complaining and a review of comparable salaries.

In October 2007, the then Chair of OSU's Department of Pathology, Dr. Sanford Barsky, filed research misconduct allegations against Plaintiff. These allegation targeted six articles published by Plaintiff, one in 1997, one in 2001, one in 2004, two in 2006, and one in 2007. Barsky essentially questioned Plaintiff's competence regarding the processes involved in the research underlying the six articles and asserted that Plaintiff failed to keep appropriate notebooks or research notes documenting this research.

In response, OSU's Dr. Caroline Whitacre, the then Vice Dean for Research, met in November 2007 with Research Compliance Officer Jennifer Moseley and Dr. Todd Guttman, the Associate Vice President for Research Compliance, in January 2008. Whitacre and Guttman concluded that the charges might indicate possible misconduct in violation of university policy. In 2008, Whitacre informed Plaintiff of the charges and the possibility of misconduct. OSU then formed a Committee of Initial Inquiry. Investigating the allegations, the committee rejected the

more general allegations by Barsky of Plaintiff's asserted incompetence and lack of integrity while initially finding sufficient evidence targeting more specific allegations that Plaintiff had failed to maintain appropriate research records.  It is not wholly apparent to this Court why Plaintiff did not immediately produce the research records at issue–Plaintiff's explanations range from self-sabotaging rationalizations to unclear demands for special accommodations that the inquiry process does not apparently afford as an entitlement–but after waiting approximately a year, Plaintiff eventually produced the various records supporting his research processes and results.  The committee then deemed the evidence insufficient to support the misconduct allegations and dismissed the allegations.

The next year, in April 2009, Plaintiff filed Case No., 2:09-cv-312, an action against many of the same defendants named in the instant case and predicated on the same basic allegations and claims.  That case remains pending before the undersigned, and the defendants in that case have filed motions to dismiss.[1]  Shortly after the filing of this first lawsuit, the federal government's Office of Research Integrity ("ORI") sent OSU a May 2009 letter containing allegations of research misconduct by Barsky against Plaintiff.  These research misconduct allegations essentially tracked the 2007 allegations against Plaintiff, although the allegations now encompassed additional publications.  ORI directed OSU to reopen the prior inquiry.  The OSU committee that examined the allegations this time consulted  a board-certified pathologist and concluded that there was sufficient evidence of possible falsification concerning images

---

[1] Before the Court could rule on those motions, Plaintiff then filed the instant case in late March 2010.  Given the asserted immediacy of the motion for injunctive relief filed in the instant case, this Court held the motions to dismiss pending in the first case in abeyance, with disposition to come subsequent to today's decision.

contained in two of the publications involved.  Plaintiff appealed this conclusion.  During this appeal, Plaintiff for the first time disclosed additional slides and attributed his failure to present these slides earlier to miscommunication.  There has been no decision on the remaining misconduct allegations, and any such decision is subject to a multi-layered appeal process.

During this re-opened inquiry into Plaintiff's research, Plaintiff presented research misconduct allegations against Barsky in July 2009.  Plaintiff has characterized the assertion of these allegations as a scientific experiment to see whether he and Barsky received the same or different treatment.  In response to the allegations against Barsky, Whitacre appointed a separate and independent committee.  This committee, not part of the earlier investigation into Plaintiff, essentially found that Barsky had either engaged in self-plagiarism (not within the institutional definition of misconduct) or that he had committed unintentional errors.  The committee concluded that there was insufficient evidence of research misconduct by Barsky.  The January 7, 2010 report of the committee found the misconduct allegations to be frivolous and suggested that OSU take appropriate action against Plaintiff.  Plaintiff unsuccessfully appealed.

Plaintiff's latest complaint, subsequently filed in March 2010, names the following as defendants: Whitacre; Moseley; Guttman; Dr. Wiley Souba, Dean of The Ohio State University College of Medicine; John Dahlberg, Director of the Division of Investigative Oversight, Office of Research Integrity of the United States Department of Health and Human Services; Kathleen Sebelius, Secretary of the United States Department of Health and Human Services; Francis Collins, Director of the National Institutes of Health; The Ohio State University; OSU Pathology Services, LLC; and Ohio State University Physicians, Inc.  (Doc. # 2.)  The arguably less than clear four-count complaint asserts a claim against all these defendants for retaliation in violation

4

of 31 U.S.C. § 3720(h), a claim for retaliation (apparently under 42 U.S.C. § 1983, 1985 and 2000-5(e)(3)(A)) against the OSU Defendants, a claim for violation of the Equal Protection Clause of the Fourteenth Amendment (apparently under at least § 1983) against the OSU Defendants, and a claim for violation of the 2009 Fair Pay Protection Act against The Ohio State University, OSU Pathology Services, LLC, and Ohio State University Physicians, Inc. (Doc. # 2 ¶¶ 144-68.)

On the same day in which he filed this newest action, which the Clerk randomly assigned to a different judge under routine filing procedures, Plaintiff also filed a motion for a temporary restraining order and a preliminary injunction. (Doc. # 4.) Because the instant case was related to the earlier case, the second case was subsequently transferred from the docket of the judge to whom it was initially assigned to the undersigned. (Doc. # 6.) The undersigned then conducted a March 23, 2010 informal telephone conference pursuant to S. D. Ohio Civ. R. 65.1(a) and set the motion for injunctive relief for an in-court hearing.

The Court held the hearing on March 30 and April 2, 2010. At the beginning of the hearing, Plaintiff's counsel limited the relief requested to six of the eight grounds initially set forth in the motion for injunctive relief. Plaintiff therefore seeks injunctive relief

> (1) enjoining Defendants from terminating and/or suspending his employment and tenure status; (2) ordering Defendants Dahlberg, Whitacre, Guttman and Moseley to appoint a board certified pathologist with specialization in anatomic pathology to evaluate the Barsky evidence of research misconduct and federal grant fraud; (4) ordering Defendants Dahlberg, Whitacre, Guttman and Moseley to convene a Committee of Inquiry with one or more committee members who have relevant experience in anatomic pathology; (5) ordering Defendants Dahlberg, Whitacre, Guttman and Moseley to remove the allegation and complaint against Dr. Nuovo that he maliciously filed a complaint with the University of Nevada regarding Barsky because such charge os not part of the research misconduct charges initiated by Dr. Nuovo against Barsky . . . and [(6)] enjoining Defendant Sedmak from using current and upcoming NIH and other grants to retaliate against Dr. Nuovo.

5

(Doc. # 4, at 1-2.)  The Court received testimony related to this potential relief from Moseley, Whitacre, Plaintiff, and Sedmak.  At the conclusion of the hearing, the Court finalized a deposition schedule and permitted the filing of post-hearing briefs.  (Doc. # 17.)  To the extent that they have elected to do so, the parties have completed such post-hearing work, and the motion for injunctive relief is ripe for disposition.

## II.  Discussion

### A.  Standard Involved

The Sixth Circuit Court of Appeals has explained the inquiry involved in addressing either a motion for a temporary restraining order or for a preliminary injunction:

> "When ruling on a motion for [injunctive relief], a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.,* 110 F.3d 318, 322 (6th Cir.1997) (citations omitted)).  *See also United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)).  The court of appeals has further explained that a district court should not consider the foregoing factors as prerequisites to be met; rather, these factors are to be balanced in a weighing of the equities involved.  *Edward Rose & Sons*, 384 F.3d at 261.

**B. Discussion**

Setting aside for the moment the notable arguments offered by several defendants that Plaintiff has failed to assert viable claims against them under 42 U.S.C. § 1983 or the False Claims Act–the Court will likely revisit these issues in a future decision–this Court moves to Plaintiff's failure to present evidence demonstrating a right to injunctive relief against *any* defendant related to any such assumed claim.  The first factor this Court must weigh in determining whether temporary injunctive relief is warranted is whether Plaintiff has established a substantial likelihood or probability of success on the merits.  Having considered the written submissions in this case, the testimony presented, and the exhibits entered into the record, the Court concludes that Plaintiff has not demonstrated a sufficient likelihood of prevailing on the merits.  Similarly, the evidence before this Court fails to persuade that there is an imminent risk of irreparable harm necessitating injunctive relief, a conclusion that speaks to the second injunctive relief factor.

The crux of Plaintiff's argument is that he is going to lose his job and reputation because he is a self-avowed whistleblower who sought to protect patients from misdiagnoses and protect academia and medicine from research dishonesty.  Plaintiff has attempted to cast his own conduct as a crusading endeavor in pursuit of truth while concurrently painting Defendants' actions as nefarious conduct intended to intimidate and punish him in an effort to conceal lapses in the standard of medical care and in the varied administrative and institutional procedures surrounding the events described herein.  Such simplification by Plaintiff of the relevant events minimizes his own at times unusual conduct and either misconstrues or simply rejects the institutional processes and decisionmaking with which he is involved.  Mere disagreement with

Defendants' actions and policies does not equate to a strong likelihood of prevailing on the Complaint.

Plaintiff asks this Court to build inference upon inference and to accept conclusory speculation as evidence. For example, he emphasizes that he had never had a research misconduct complaint filed against him until he began asserting that Ohio State had misdiagnosis and grant fraud issues. Noting simple temporal proximity does not constitute demonstrating a strong likelihood of proving a cause-and-effect connection. Instead, the evidence presented repeatedly falls short of persuasive support for Plaintiff prevailing on the merits. Defendants' proffered, non-retaliatory reasons for various actions paint a picture that outright contrasts with the generally tenuous conclusions Plaintiff asks the Court to accept. A consistent flaw in Plaintiff's case is this lack of a causal connection between events. Plaintiff may well be correct that unacceptable misdiagnoses occurred and that various aspects of Barsky's research are flawed if not fraudulent. But even assuming *arguendo* the plausibility of such contentions–which this Court need not even do in this injunctive-relief context–there remains a dearth of evidence supporting the link between such facts and what has happened or might happen to Plaintiff.

Simply stated, rather than revealing conspiratorial retaliation by Defendants designed to effectuate a cover-up and exact revenge on Plaintiff, this litigation more likely presents the issue of whether professional disagreements have led to personal vendettas so that Plaintiff's pursuit of Barsky has backfired, leaving Plaintiff subject to the type of professional ramifications he sought to inflict upon his former colleague. To be clear, this Court does not much doubt Plaintiff's initial good motives. The Court is, however, concerned with the subsequent animus

underlying his later conduct and perceptions. Plaintiff's now questionable motivations are reflected in various incidents, including his continued pursuit of Barsky despite the fact that Barsky is at another out-of-state institution and despite the fact that Plaintiff's inexplicable conduct ran him afoul of OSU's confidentiality provisions.

Based on the evidence before this Court, it appears unlikely that Plaintiff can prevail on his retaliation claims because there is a want of retaliatory conduct against him. Rather, the most likely construction of the evidence is that Plaintiff has sought to use every aspect of the research misconduct process to retaliate against Barsky for personal and professional differences between the two men. Some evidence suggests that Barsky has also engaged in similarly odd conduct. Perhaps these two men need to leave one another alone.

Another reasonable construction of the evidence is that Plaintiff has unfortunately but continually misconstrued the investigative and funding processes with which he is involved, either unintentionally or at times perhaps willfully, so that he has perceived elaborate mechanisms of treachery where there are none, resulting in a lack of understanding and cooperation that likely only proves detrimental to Plaintiff. Plaintiff withheld evidence because the committee would not receive it in the manner he sought to disclose it, but the university's procedures that apply to every researcher do not afford him such a right.

There is no evidence that the investigatory deck has been stacked against Plaintiff. For example, no one on the committees has complained that anyone tried to influence them or their deliberations, and Plaintiff's concerns over the deliberative influence of various actors, such as Whitacre, overlooks that Whitacre and others have no role in the final committee decisions. Whitacre and Moseley do not control the committee, but assist its formation and help effectuate

9

its process.

Moreover, Plaintiff's contentions that there is no federal funding involved to provide a predicate foundation for portions of the investigations against him fall flat when individuals such as Whitacre testified that they had no memory of Plaintiff telling her of such asserted errors. Plaintiff disputes this last point and suggests that he revealed in September 2009 that no federal funds went to the challenged research, but to whatever extent the Court might credit his testimony in this regard, the limited discrepancy does not establish success on the ultimate merits of his claims. Even if Plaintiff is correct that ORI exceeded its authority and that OSU erred in pursuing an investigation, doubtful propositions given the authorities referenced in the briefing (Doc. # 26), the evidence suggests that any such errors were inadvertent and simply neither retaliation nor part of a plan to silence Plaintiff.

It appears that Plaintiff has often pursued retaliatory efforts against Barsky to his own embarrassment or even detriment. One example of the former would be Plaintiff's efforts to obtain comment from the Division of Investigative Oversight of the ORI on the research misconduct investigation against him. The record contains a number of instances when Plaintiff sent unsolicited and apparently impermissible material to ORI, and that particular effort resulted in a June 17, 2009 letter from John Dahlberg, the Director of ORI's Division of Investigative Oversight, in which Dahlberg stated, "I find it highly inappropriate for you to attempt to obtain DIO's comments on allegations made about your research at this stage in the process." (Gov't Ex. 1, at 2.) Perhaps the animus behind Plaintiff's perceptions is best encapsulated in the perspective presented in his undated letter to Sedmak, which apparently was written on November 25, 2009. Plaintiff writes:

> I remain committed to helping OSU/OSUMC rectify the problems caused by Barsky's scientific fraud. Indeed, it can be argued that my expertise with the methods involved allows me to be of enormous potential help to OSU/OSUMC. If you persist in your unfounded charges against me, any reasonable and objective person would conclude that you are exposing OSU/OSUMC to an increased degree of risk in regards to Barsky's fraud.

(Plt's Ex. 15.) Such conflation of the events–a "Barsky committed fraud, not me, and by conducting a meritless investigation of me you risk losing the aid of the person who can help you" perspective–appears to have colored much of the proceedings (and likely has prevented the parties from more easily resolving many of the issues involved in this litigation).

This "it's not my fault" view apparently informs Plaintiff's perception of the investigations with which he has been involved. Plaintiff argues that this Court should act to reconstitute the investigatory commission involved and to order the sequestration of select evidence, but there is no evidence that the process is tainted, that the process does not afford him avenues of recourse to address many if not all of his concerns, or that the Barsky evidence is even under the control of any party within the reach of this Court. Absent sufficient cause, the Court cannot and will therefore not inject itself into the process as Plaintiff requests.

The mistrust that has arisen and the positions growing out of that mistrust are unfortunate, given that many of Plaintiff's allegations might have been or could be resolved if the parties simply came to the table to discuss their issues. For example, it appears that Plaintiff does not understand the salary issues; his testimony and what he wants belie the apparent process, and dialogue and understanding might remove this issue from this litigation. But today's inquiry is not concerned with reconciliation; it is concerned with whether Plaintiff has met his burden. There is no evidence suggesting that Plaintiff has a strong likelihood of success on his claims. There is also no such prevailing evidence that Plaintiff is experiencing salary

11

retaliation at this time, that Defendants manipulated the research misconduct process, or that a conspiracy to silence Plaintiff exists. And there is no persuasive evidence that Plaintiff's speech rights have actually been chilled due to Defendants' actions (as opposed to Plaintiff's distinct misperception of those actions) or that he is likely to be terminated imminently.

This last point warrants additional comment. The evidence unquestionably presents only an as-yet *incomplete* process that *could* lead to *possible* disciplinary action against Plaintiff *at some indeterminate point in the future*. The evidence teaches that such disciplinary action would be subject to a surprisingly extended process during which Plaintiff, who would remain a tenured faculty member throughout the process, could seek review and potential absolution from any adverse action taken against him. Moreover, while arguing on one hand that he fears a negative result warranting preemptive injunctive relief, Plaintiff has also recently asserted a contrary position in separate litigation proceedings in which he even expressed optimism about the process. Plaintiff failed to reconcile these contradictions during his hearing testimony.

In light of the foregoing, the Court must conclude that Plaintiff has failed both to demonstrate a strong likelihood of success on the merits of his claims and to demonstrate that an imminent risk of irreparable harm exists. This is not to say that Plaintiff may not be able to produce new evidence to prevail on his claims. It is intended to make clear that the facts as presented here will simply not suffice.

Having recognized that the first two injunctive relief factors weigh against granting such relief, the Court need not discuss the remaining factors. This is because it is well settled that "a district court is not required to make specific findings concerning each of the four factors used in determining a motion for [injunctive relief] if fewer factors are determinative of the issue." *Nat'l*

*Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003).

### III.  Conclusion

For the reasons set forth above, the Court **DENIES** Plaintiff's motion for a temporary restraining order and preliminary injunction.  (Doc. # 4.)

**IT IS SO ORDERED**.

                                            /s/ Gregory L. Frost
                                     GREGORY L. FROST
                                     UNITED STATES DISTRICT JUDGE